UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

| | |
|---|---|
| United States of America, | Criminal No. 15-89 (JNE/FLN) |
| Plaintiff, | |
| v. | **REPORT AND RECOMMENDATION** |
| Charles Earl Wright, Jr., | |
| Defendant. | |

___

Thomas Calhoun-Lopez, Assistant United States Attorney, for Plaintiff.
Robert Paule for Defendant.

___

**THIS MATTER** came before the undersigned United States Magistrate Judge on May 13, 2015 on Defendant's motion to suppress statement, admissions, and answers (ECF No. 21). The matter was referred to the undersigned for a report and recommendation pursuant to 28 U.S.C. § 636 and Local Rule 72.1. At the hearing, the Government offered testimony from Sergeant Gregory Freeman of the Minneapolis Police Department. For the reasons set forth below, the Court recommends that Defendant's motion be **GRANTED in part** and **DENIED in part**.

## I. FINDINGS OF FACT

On February 7, 2015, Defendant was shot seven times by the occupants of a passing vehicle as he stood outside of Choice Gentlemen's Club and Sexworld in downtown Minneapolis. According to the Government, Defendant produced a handgun and returned fire on the vehicle as it drove away. As a result of his injuries, Defendant was hospitalized at Hennepin County Medical Center ("HCMC"). During his stay at HCMC, Defendant was treated in the Burn Unit, which is routinely used to provide care to patients with gunshot wounds. The Burn Unit is a secured area with

restricted visiting procedures and a uniformed Hennepin County deputy monitoring access. These additional security measures are provided for gunshot patients to protect against any further retaliation by the perpetrators.

On February 10, 2015, Minneapolis Police Sergeants Gregory Freeman and Sarah Metcalf arrived at HCMC to interview Defendant regarding his role in the shooting.[1] Both officers were dressed in plain clothes and carried a firearm on their right hip. Because they had to enter the Burn Unit, both officers wore protective hospital gowns that covered their clothing and firearms. Upon entering, Defendant was seen walking around and talking on his cell phone. The officers identified themselves and explained that they wanted to discuss the shooting. According to Sergeant Freeman, Defendant was not happy to see the officers and was uncooperative. Although Defendant informed the officers that he did not want to speak with them, Sergeants Freeman and Metcalf insisted on speaking and did not leave at Defendant's request.

Throughout the duration of the interview, the Defendant was never handcuffed, never told he was a suspect of a crime, and never told he must stay in a particular area. The officers never drew their firearms and never yelled or made any threats towards Defendant. Sergeant Freeman testified that he believed Defendant was lucid and coherent throughout the interview. According to Sergeant Freeman, Defendant was considered a victim at this point of the investigation, not a suspect, and he was not arrested at the conclusion of the interview.[2] Defendant was discharged from HCMC later

---

[1] Sergeant Freeman attempted to visit Defendant on February 9, but he was advised by the nurse that Defendant was heavily medicated. The nurse cleared Sergeant Freeman to visit the following day, February 10.

[2] It was only after the interview that Sergeant Freeman reviewed Defendant's criminal record and learned he had a prior felony conviction. Additionally, Sergeant Freeman

that same day.

On February 14, 2015, Defendant was questioned a second time by Sergeant Freeman while he was incarcerated at the Hennepin County jail. Sergeant Freeman read Defendant his *Miranda* rights at that time. Defendant responded by handing Sergeant Freeman the business card of his attorney. Despite being handed the attorney's business card, Sergeant Freeman pressed Defendant to view a photo-lineup of potential suspects in the shooting and executed a search warrant for Defendant's DNA. Additionally, Sergeant Freeman questioned Defendant about the people who had shot him and about the suspect vehicle.

On February 20, 2015, Defendant called Sergeant Freeman and left a voice message requesting the return of some of his property, specifically his shoes and cell phone. Sergeant Freeman returned the call and informed Defendant that his property could not be returned at this time because it was evidence in the shooting. Sergeant Freeman then began to discuss with Defendant the circumstances surrounding the shooting. He did not inquire about Defendant's counsel or provide a *Miranda* warning during the phone interview. Sergeant Freeman informed Defendant that he could arrange a time to view the surveillance video of the shooting. Defendant indicated that he wanted to see the video and made an appointment to view the surveillance video later that same day in Room 108 of Minneapolis City Hall.

Defendant came to Room 108 of City Hall to watch the video as arranged. In order to enter Room 108, visitors must pass through a security door monitored by an unarmed, non-uniformed

---

had not viewed surveillance video of the shooting before the interview and therefore did not know that Defendant had returned fire on his assailants. On February 12, 2015, Defendant was arrested and formally charged in Hennepin County District Court with illegally possessing a firearm and second degree assault.

secretary. There is no checkout process, however, visitors can simply walk out and leave Room 108 at any time. Upon being notified of his arrival, Sergeant Freeman greeted Defendant in the waiting room and escorted him inside to Interview Room M. Defendant was not handcuffed and was told that he was free to go, as this appointment was a "voluntary contact." While the surveillance video was played for Defendant, Sergeant Freeman spoke with Defendant about how he was able to "shoot back" at his assailants. They also discussed the suspect vehicle. The meeting was recorded for both audio and video. At the conclusion of the surveillance video, Defendant left and went downstairs to the property room to pick up some items that could be released at that time. Shortly thereafter, Sergeant Freeman also arrived at the property room to speak to Khareem Edwards, Defendant's brother, who was a suspect in Defendant's shooting. Upon seeing Sergeant Freeman speaking with Edwards, Defendant walked over and informed Sergeant Freeman that Edwards was not at the scene of shooting.

## II. CONCLUSIONS OF LAW

Defendant moves to suppress any statements, admissions, and answers he made to law enforcement following his shooting on February 7, 2015. Mot. to Suppress, ECF No. 21. Defendant argues that these statements were not voluntary, and were obtained in violation of his rights guaranteed by the Fifth and Sixth Amendments. *Id*. As outlined above, Defendant made statements to law enforcement on four separate occasions: (1) at HCMC on February 10, 2015; (2) at the Hennepin County jail on February 14, 2015; (3) during a phone conversation with Sergeant Freeman on February 20, 2015; and (4) at Room 108 of City Hall on February 20, 2015. *Id*. at 1–2. The Government opposes the motion in part, arguing that the statements made at HCMC on February 10, 2015 were voluntary and non-custodial, and that both statements made on February

20, 2015 were voluntary and at Defendants own initiation. Gov.'s Resp. to Def.'s Mots. 4–5, ECF No. 22. The Government has, however, represented to the Court that it does not intend to use any statements made at the Hennepin County jail on February 14, 2015 at trial. *Id*. at 5. Therefore, Defendant's motion with respect to this particular issue is moot.

1.   **Statements Made at HCMC on February 10, 2015**

   a.   **Custodial Nature**

Defendant first challenges his interrogation by Minneapolis Police Sergeants Freeman and Metcalf on February 10, 2015, at HCMC, on the grounds that his statements were taken in violation of his Fifth Amendment rights under *Miranda*. ECF No. 21 at 1. Law enforcement officers must inform suspects of their *Miranda* rights before subjecting them to custodial interrogations. *United States v. Sanchez*, 676 F.3d 627, 630 (8th Cir. 2012). "Failure to do so results in a violation of the suspect's Fifth Amendment rights and renders any statement gained from the violation inadmissible in the government's case-in-chief." *Id.* A custodial interrogation is defined as "questioning initiated by law enforcement officers after a person has been taken into custody or otherwise deprived of his freedom in any significant way." *United States v. Flores-Sandoval*, 474 F.3d 1142, 1147 (8th Cir. 2007). Custody depends on the totality of the circumstances, and the Eighth Circuit considers six factors when determining whether a person was in custody for purposes of the Fifth Amendment:

   (1)   whether the suspect was informed at the time of questioning that the questioning was voluntary, that the suspect was free to leave or request the officers to do so, or that the suspect was not considered under arrest;
   (2)   whether the suspect possessed unrestrained freedom of movement during questioning;
   (3)   whether the suspect initiated contact with authorities or voluntarily acquiesced to official requests to respond to questions;
   (4)   whether strong arm tactics or deceptive stratagems were employed during questioning;
   (5)   whether the atmosphere of the questioning was police-dominated; or
   (6)   whether the suspect was placed under arrest at the termination of the

questioning.

*United States v. Griffin*, 922 F.2d 1343, 1349 (8th Cir. 1990). "The ultimate test is whether a reasonable person in that position would have felt free to end the interview." *United States v. Aldridge*, 664 F.3d 705, 711 (8th Cir. 2011).

After reviewing the record, the Court concludes that Defendant was not "in custody" for purposes of the Fifth Amendment when he was interviewed at HCMC. Although the officers did not leave when initially requested, it is clear to the Court that, based on the totality of the circumstances, a reasonable person in Defendant's position would have felt free to end the interview at any time. Defendant was informed from the outset that the officers were there only to speak to him about the shooting, he was never restrained in any way during questioning, he voluntarily answered the questions asked of him, no "strong-arm" tactics were used to persuade Defendant to talk, the atmosphere was not police-dominated, and he was not placed under arrest at the conclusion of questioning. Indeed, the officers considered Defendant a victim at this point of the investigation, not a suspect. Accordingly, the Court finds that no Fifth Amendment violation occurred.

**b.    Voluntariness**

Defendant further challenges his February 10, 2015, interrogation on the grounds that his statements were not given voluntarily. ECF No. 21 at 1; Def.s' Mem. in Supp. of Mot. to Suppress 1, ECF No. 25. "A statement is involuntary when it was extracted by threats, violence, or express or implied promises sufficient to overbear the defendant's will and critically impair his capacity for self-determination." *United States v. Garlewicz,* 493 F.3d 933, 935–36 (8th Cir. 2007) (quoting *United States v. Hyles,* 479 F.3d 958, 966 (8th Cir. 2007)). When determining the voluntariness of statements, courts examine the totality of the circumstances. *Id*. at 935.

Here, Defendant argues that he was confined to his hospital room, recovering from numerous

6

life-threatening gunshot wounds, and told the police that he did not want to speak with them. ECF No. 25 at 2. Yet, the officers refused to leave until he gave a statement. *Id*. Defendant compares his circumstances to those in *Mincey v. Arizona*, 437 U.S. 385, 398–99 (1978) (holding that a statement was involuntary because the defendant was lying on his back in a hospital bed with "unbearable leg pain," repeatedly expressed his wish not to be questioned, and appeared "confused and unable to think clearly" while "encumbered by tubes, needles, and breathing apparatus"). Conversely, the Government contends that there is no evidence that Defendant was in pain or duress during the interview. Gov.'s Mem. in Opp'n to Def.'s Mot. to Suppress at 5, ECF No. 26. He appeared coherent and lucid, and the nurse cleared the police to speak with him. *Id*.

The Court concludes that, based on the totality of the circumstances, Defendant's statements were not extracted by actions sufficient to overbear his will and critically impair his capacity for self-determination. Although Defendant was the victim of multiple gunshot wounds, at the time of the interview he showed no signs of severe pain or duress. Indeed, he was walking around his hospital room talking on his cell phone and making preparations to leave when the police arrived. Furthermore, the nurse permitted the officers to speak with him as he was no longer heavily medicated and was well enough for visitors. Sergeant Freeman testified at the hearing that Defendant seemed coherent and lucid throughout the interview. Although the officers described Defendant as uncooperative, they never threatened him in any way, or made promises of any kind to persuade him to talk. Accordingly, the Court finds that Defendant's reliance on *Mincey* is misplaced as the facts in the present case are clearly distinguishable. Consequently, the Court concludes that Defendant's statements were voluntary and therefore admissible.

**2.    Statements Made on February 20, 2015**

Defendant additionally moves to suppress statements he made to Sergeant Freeman during

the phone call and subsequent meeting at Room 108 of City Hall on February 20, 2015. ECF No. 21 at 2. Defendant contends that such questioning violated his Sixth Amendment right to counsel. *Id*. It is well-established that "once the adversary judicial process has been initiated, the Sixth Amendment guarantees a defendant the right to have counsel present at all 'critical' stages of the criminal proceedings." *Montejo v. Louisiana*, 556 U.S. 778, 786 (2009). Interrogation by the Government is such a stage. *Id*. However, it is just as established that a defendant may waive his Sixth Amendment right to counsel so long as such waiver is voluntary, knowing, and intelligent. *Id*. He may do so "whether or not he is already represented by counsel; the decision to waive need not itself be counseled." *Id*. A valid waiver of the Sixth Amendment right to counsel must reflect "an intentional relinquishment or abandonment of a known right or privilege." *Brewer v. Williams*, 430 U.S. 387, 404 (1977). The burden of proving that a defendant waived his right to have counsel present at an interrogation rests with the Government. *See id*.

Here, Defendant argues that the Government has not met their burden of establishing a knowing and intelligent waiver of Sixth Amendment rights. ECF No. 25 at 3. Although Defendant placed the initial phone call to attempt to retrieve his property from Sergeant Freeman, this contact was used as "subterfuge" to interrogate the Defendant further about the shooting in violation of his right to counsel. *Id*. Further, the same analysis extends to the statement elicited from Defendant later that same day in Room 108 of City Hall. *Id*. In contrast, the Government argues that Defendant initiated contact when he spontaneously called Sergeant Freeman on the phone thereby electing to contact law enforcement directly rather than through his attorney. ECF No. 26 at 6. This, according to the Government, demonstrates that Defendant waived his right to counsel in the subsequent interactions with Sergeant Freeman. *Id*.

Whether a defendant initiates contact with law enforcement is a significant component of the

Sixth Amendment waiver analysis. *See United States v. Garlewicz*, 493 F.3d 933, 936–37 (8th Cir. 2007) ("Where the defendant initiates contact . . . he may validly waive his Sixth Amendment rights, even if he is represented by an attorney."); *see also Michigan v. Harvey*, 494 U.S. 344, 352 (1990) ("[N]othing in the Sixth Amendment prevents a suspect charged with a crime and represented by counsel from voluntarily choosing, on his own, to speak with police in the absence of an attorney."). In the present case, however, Defendant only initiated contact for the limited purpose of recovering his seized property. Defendant did not call Sergeant Freeman to discuss the ongoing investigation regarding the shooting or the circumstances of the charges filed against him. Indeed, it was Sergeant Freeman who initiated such conversation when he returned Defendant's phone call and expanded the scope of that conversation to include the investigation and the surveillance video. Accordingly, it cannot be said that Defendant demonstrated a willingness and desire to generally discuss the ongoing investigation. *See Owens v. Bowersox*, 290 F.3d 960, 962–63 (8th Cir. 2002) (stating that a defendant initiates interrogation if he "evinces a willingness and a desire for a generalized discussion about the investigation"). Thus, the Court concludes that in making the telephone call to Sergeant Freeman, and in later meeting with him at Room 108 of City Hall, Defendant did not "initiate contact" with law enforcement within the meaning of *Montejo* and *Garlewicz*.

Moreover, the Government has additionally failed to meet its burden to establish that Defendant voluntarily, knowingly, and intelligently waived his right to counsel. Sergeant Freeman is the same police officer that conducted the interrogation at the Hennepin County jail on February 14, 2015, wherein Defendant invoked his right to counsel. Defendant could therefore reasonably expect that his request to be free from further questioning would be honored. More importantly, the Government provides no evidence that anyone gave Defendant a *Miranda* warning during the meeting, or otherwise attempted to clarify Defendant's wishes in light of his prior invocation of his

right to counsel. On these facts, the Court concludes that there was no waiver of Defendant's Sixth Amendment right to counsel. *See Brewer*, 430 U.S. at 404 (concluding that a valid waiver of the right to counsel requires relinquishment not merely comprehension). Because the Court finds that Defendant did not waive his Sixth Amendment right to counsel prior to his conversations with Sergeant Freeman on February 20, 2015, any statements made by Defendant during the phone call and subsequent meeting at Room 108 of City Hall must be suppressed.

### III. RECOMMENDATION

Based upon the foregoing and all the files, records, and proceedings herein, **IT IS HEREBY RECOMMENDED** that:

1. Defendant's motion to suppress statement, admissions, and answers (ECF No. 21) should be **GRANTED in part** and **DENIED in part** as follows:

    a. To the extent Defendant seeks to suppress statements made to law enforcement during the February 10, 2015 interview at HCMC, the motion should be **DENIED**.

    b. To the extent Defendant seeks to suppress statements made to law enforcement during the February 14, 2015 interrogation at the Hennepin County jail, the motion should be **DENIED as moot**.

    c. To the extent Defendant seeks to suppress statements made to law enforcement during the February 20, 2015 phone call and subsequent questioning in Room 108 of Minneapolis City Hall, the motion should be **GRANTED**.

DATED: June 11, 2015                                *s/Franklin L. Noel*
                                                    FRANKLIN L. NOEL
                                                    United States Magistrate Judge

Pursuant to the Local Rules, any party may object to this Report and Recommendation by filing with the Clerk of Court and serving on all parties, on or before **June 26, 2015**, written objections that specifically identify the portions of the proposed findings or recommendations to which objection

is being made, and a brief in support thereof. A party may respond to the objecting party's brief within fourteen (14) days after service thereof. All briefs filed under the rules shall be limited to 3,500 words. A judge shall make a de novo determination of those portions to which objection is made.

Unless the parties are prepared to stipulate that the District Court is not required by 28 U.S.C. § 636 to review a transcript of the hearing in order to resolve all objections made to this Report and Recommendation, the party making the objections shall timely order and cause to be filed by **June 26, 2015** a complete transcript of the hearing.

This Report and Recommendation does not constitute an order or judgment of the District Court, and it is, therefore, not appealable to the Circuit Court of Appeals.